1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

7
8
9
10
11
12
13
14
15

ROZ GLASSER,

               Plaintiff,

    v.

NATIONAL MARINE FISHERIES
SERVICE, et al.,

               Defendants,

CITY OF SEATTLE and
WASHINGTON DEPARTMENT OF
FISH AND WILDLIFE,

               Intervenor-
               Defendant

CASE NO. C06-561BHS


ORDER GRANTING
DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT

16
17
18
19
20
21

      This matter comes before the Court on Plaintiff's Motion for Summary Judgment (Dkt. 70), Federal Defendants' Cross-Motion for Summary Judgment (Dkt. 75) and Intervenor-Defendants' Cross-Motion for Summary Judgment (Dkt. 74). The Court has considered the pleadings filed in support of and in opposition to the motions and the remainder of the file and grants Federal Defendants' motion and Intevenor-Defendants' motion for the reasons stated herein.

22

**I. PROCEDURAL BACKGROUND**

23

**A.      Parties**

24
25
26
27

      On April 20, 2006, Plaintiff filed a complaint against Defendant National Marine Fisheries Service ("NMFS") and Defendant D. Robert Lohn, Regional Administrator of the National Oceanic and Atmospheric Administration (collectively "federal Defendants") challenging

28

the Endangered Species Act exemption granted by [NMFS] for the City of Seattle's . . . construction and operation of a sockeye hatchery in the Cedar River watershed without imposing necessary conditions to prevent the hatchery from adversely impacting the survival and recovery of Puget Sound Chinook salmon, a species listed under the [Endangered Species Act], and Steelhead Trout, a species recently proposed for listing under the [Endangered Species Act].  Specifically, this action challenges the [NMFS's]: (1) approval of the Cedar River Habitat Conservation Plan . . . ; (2) issuance of the corresponding Incidental Take Permit . . . ; (3) issuance of a final Biological Opinion . . . ; and (4) entry into the corresponding Implementation Agreement . . . and Landsburg Mitigation Agreement.

Dkt. 1, ¶ 1.  Plaintiff requested that the Court:

(1) declare that NMFS failed to use the best available scientific information, made findings that run contrary to the evidence in the record and the legal requirements of Section 10 of the Endangered Species Act . . . , and acted arbitrarily, capriciously, and contrary to both the [Endangered Species Act] and the National Environmental Policy Act . . . ; and (2) order NMFS to withdraw its approval of the [Cedar River Watershed Habitat Conservation Plan] and issuance of the [Incidental Take Permit] insofar as those documents approve or provide protection from enforcement of the [Endangered Species Act] Section 9 for the City's construction and operation of a sockeye hatchery on the Cedar River . . . .

*Id.*

On August 3, 2006, the City of Seattle filed a Motion to Intervene pursuant to Fed. R. Civ. P. 24(a), "because it is the party that will be most affected by the outcome."  Dkt. 15 at 1.  On August 18, 2006, the Honorable John C. Coughenour granted the City's motion.  Dkt. 20.

On September 26, 2006, the Washington Department of Fish and Wildlife filed a Motion to Intervene.  Dkt. 24.  On November 17, 2006, Judge Coughenour granted the Department's motion.  Dkt. 29.

**B.    Stay and Supplemental Pleadings**

On August 7, 2007, NMFS approved the City of Seattle's request for an amendment to the Incidental Take Permit at issue in this case.  Dkt. 47 at 1.  In a Stipulated Motion to Stay Case, Plaintiff notified the Court that she intended "to challenge the amendment under the Administrative Procedure Act and/or the Endangered Species Act."  *Id.* at 1-2.  To facilitate the efficient resolution of this case and of the Plaintiff's challenge to the amendment, the parties agreed as follows:

1.  The present case, including any pending motions, should be stayed until November 5, 2007, to allow the Plaintiff time to serve a 60-day notice of her intent to challenge NMFS's approval of the amendment to the City's Incidental Take Permit No. 1235 under 16 U.S.C. § 1540(g) . . . and then to file a motion for an order permitting filing of a Supplemental Complaint under [Fed. R. Civ. P.] 15(d).

2.  NMFS, the City, and the State agree that they will not oppose Plaintiff's motion for an order permitting filing of a Supplemental Complaint as long as the changes are solely to add facts, allegations, and claims under the Administrative Procedure Act and/or the Endangered Species Act concerning NMFS's August 7, 2007 approval of the City of Seattle's request to amend its Incidental Take Permit No. 1235.

3.  If, in a final decision on Plaintiff's Supplemental Complaint, to be filed under paragraph 2 above, the court issuing such final decision upholds the amendment that NMFS approved on August 7, 2007 to the City's Incidental Take Permit No. 1235, then the Plaintiff will not object to entry of a dismissal of this action in its entirety with prejudice. Plaintiff agrees that litigation of the unsupplemented causes of action in the original Complaint will not proceed unless and until a final decision is reached determining that the amendment to the City's Incidental Take Permit No. 1235 is no longer in full force and effect.

Dkt. 47 at 2.  On August 31, 2007, Judge Coughenour granted the Stipulated Motion to Stay.  Dkt. 48.

On November 16, 2007, Plaintiff filed a First Supplemental Complaint that:

is based on the defendants' actions since the filing of the Complaint: Intervenor-Defendant City of Seattle has requested an amendment of the [Cedar River Habitat Conservation Plan] and [Incidental Take Permit] that remove sockeye as a "covered species" and the sockeye hatchery as a "covered activity." Plaintiff Glasser alleges that Defendant [NMFS] has approved the City's request without compliance with the [Endangered Species Act] or [the National Environment Policy Act].

Dkt. 54, ¶ 1B.

On December 12, 2007, the case was reassigned to the undersigned.  Dkt. 60.

## C.   Summary Judgment Motions

On February 29, 2008, Plaintiff filed a Motion for Summary Judgment challenging "the validity of NMFS's August 7, 2007 approval of the City of Seattle's request to amend its Incidental Take Permit No. 1235."  Dkt. 70 at 3.  On March 17, 2008, Intevenor-Defendants City of Seattle and the Washington Department of Fish and Wildlife responded and included a cross-motion for summary judgment.  Dkt. 74.  On March 18, 2008, the federal Defendants responded and included a cross-motion for

1    summary judgment.  Dkt. 75.  On May 16, 2008, Plaintiff replied to her summary

2    judgment motion and responded to Defendants' motions.  Dkt. 76.  On May 30, 2008, the

3    Intevenor-Defendants replied (Dkt. 77) and the federal Defendants replied (Dkt. 78).  On

4    June 13, 2008, Plaintiff filed a surreply.  Dkt. 79.

5            These motions are now ripe for decision.

6                              **II. STATUTORY BACKGROUND**

7    **A.      The Endangered Species Act**

8            The Endangered Species Act contains both substantive and procedural

9    requirements designed to carry out the goal of conserving endangered and threatened

10   species and the ecosystems on which they depend.  16 U.S.C. § 1531(b).  Under the Act,

11   the Secretaries of Interior and Commerce are charged with listing species as either

12   threatened or endangered.  16 U.S.C. § 1533.  Once a species is listed, certain protections

13   apply.  The three requirements relevant to this case are the "take" prohibitions contained

14   in Section 9 of the Act, 16 U.S.C. § 1538, the permitting provisions contained in Section

15   10 of the Act, 16 U.S.C. § 1539, and the consultation requirements contained in Section 7

16   of the Act, 16 U.S.C. § 1536.

17           **1.      Section 9: The "Take" Prohibitions**

18           Unless an applicable exemption applies, it is unlawful for any person to "take" a

19   fish or wildlife species which has been listed as endangered.  16 U.S.C. § 1538(a)(1)(B).

20   "Take" is defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or

21   collect . . . ."  16 U.S.C. § 1532(19).  Two distinct exemptions are relevant in this case:

22   incidental take permits issued under Section 10, 16 U.S.C. § 1539; and incidental take

23   statements issued under Section 7, 16 U.S.C. § 1536(b)(4).

24           **2.      Section 10: The Permit Provisions Applicable to Non-Federal Entities**

25           Under Section 10 of the Endangered Species Act, NMFS may issue a permit

26   allowing an entity to take a listed species under its jurisdiction despite the prohibition in

27   Section 9 "if such taking is incidental to, and not the purpose of, the carrying out of an

28

ORDER - 4

1   otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B).  NMFS, however, may only issue

2   such a permit if the applicant submits a Habitat Conservation Plan that meets certain

3   minimum statutory requirements, 16 U.S.C. § 1539(a)(2), and NMFS determines that the

4   applicant has otherwise met certain statutory and regulatory conditions under 50 C.F.R. §

5   222.307(c).

6          Although the terms of permits vary, there are usually three principal documents

7   that comprise the permit.  The first is the incidental take permit itself which is prepared by

8   NMFS.  *See, e.g.*, Administrative Record ("AR") (Dkt. 14) Volume I Document 7.  The

9   second is the applicant's Habitat Conservation Plan, which is usually incorporated by

10  reference as a term and condition of the permit.  *See, e.g.*, *id*. Document 1 ("Conservation

11  Plan").  The third document is an Implementation Agreement which is signed by both the

12  applicant and NMFS, and which clarifies the relationship between the parties.  *See, e.g.*,

13  *id*. Document 2.  Any incidental take by the permittee, consistent with the terms of the

14  incidental take permit, is not considered a prohibited take under the Act. 16 U.S.C. §§

15  1538(a), 1539.

16         Amendments or modifications to an issued permit are also covered by the

17  implementing regulation.  If a permittee seeks to amend or modify its permit, the

18  regulation provides that:

19             (a) When circumstances have changed so that an applicant or a
     permittee desires to have any term or condition of the application or permit
20   modified, the applicant or permittee must submit in writing full justification
     and supporting information in conformance with the provisions of this part
21   and the part under which the permit has been issued or requested. *Such
     applications for modification are subject to the same issuance criteria as*
22   *original applications.*
                                    ***
23             (c) All permits are issued subject to the condition that the National
     Marine Fisheries Service reserves the right to amend the provisions of a
24   permit *for just cause* at any time during its term. Such amendments take
     effect on the date of notification, unless otherwise specified.
25
     50 C.F.R. § 222.306 (emphasis added).
26

27

28

**3.      Section 7: The Consultation Provisions Applicable to Federal Agencies**

Under Section 7 of the Endangered Species Act, each federal agency must, in consultation with either the Fish and Wildlife Service or NMFS, insure that any action authorized, funded, or carried out by the agency is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of the critical habitat of the species.  16 U.S.C. § 1536(a)(2) (the species at issue in this action are under the jurisdiction of NMFS).  The Act and the implementing regulations set out a detailed consultation process with NMFS for determining the biological impacts of a proposed activity.  16 U.S.C. § 1536; 50 C.F.R. Part 402.

An agency proposing an action must, at the earliest possible time, determine whether that action "may affect" species or critical habitat for species that are listed as threatened or endangered.  50 C.F.R. § 402.14(a).  If a determination is made that the action "may affect" listed species, formal consultation with NMFS may be required.  *Id*. Formal consultation is *not* required:

> if, as a result of the preparation of a biological assessment under § 402.12 or as a result of informal consultation with the [Fisheries] Service under § 402.13, the Federal agency determines, with the written concurrence of the Director, that the proposed action is not likely to adversely affect any listed species or critical habitat[; or]
>        . . . if a preliminary biological opinion, issued after early consultation under § 402.11, is confirmed as the final biological opinion.

*Id*. § 402.14(b).  Thus, if an action agency determines that the action may affect but "is not likely to adversely affect" a listed species and the director of the consulting agency concurs in writing, the action agency may forgo formal consultation.  50 C.F.R. § 402.13.

In the alternative, if no such concurrence is reached or if the agencies agree that the action is likely to adversely affect a listed species, formal consultation must be undertaken.  50 C.F.R. §§ 402.13-402.14.  In this case, because NMFS was both the agency taking action by issuing the permit and the consulting agency by having jurisdiction over the particular species, NMFS claims that it undertook formal

consultation with itself before issuing the City of Seattle's Incidental Take Permit.  Dkt. 75 at 9.

Formal consultation procedures require the consulting agency to prepare a biological opinion.  50 C.F.R. § 402.14(g).  That opinion shall include:

> (1)     A summary of the information on which the opinion is based;
> (2)     A detailed discussion of the effects of the action on listed species or critical habitat; and
> (3)     The Service's opinion on whether the action is likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat (a "jeopardy biological opinion"); or, the action is not likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat (a "no jeopardy" biological opinion). A "jeopardy" biological opinion shall include reasonable and prudent alternatives, if any. If the Service is unable to develop such alternatives, it will indicate that to the best of its knowledge there are no reasonable and prudent alternatives.

*Id*. § 402.14(h).  When the action involves incidental take, the consulting agency must also provide a statement that:

> (i)     Specifies the impact, i.e., the amount or extent, of such incidental taking on the species;
> (ii)     Specifies those reasonable and prudent measures that the Director considers necessary or appropriate to minimize such impact;
> (iii)     In the case of marine mammals, specifies those measures that are necessary to comply with section 101(a)(5) of the Marine Mammal Protection Act of 1972 and applicable regulations with regard to such taking;
> (iv)     Sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or any applicant to implement the measures specified under paragraph (i)(1)(ii) and (i)(1)(iii) of this section; and
> (v)     Specifies the procedures to be used to handle or dispose of any individuals of a species actually taken.

*Id*. § 402.14(i).  Any taking of listed species which is subject to such an incidental take statement and in compliance with the terms and conditions in that statement is not a prohibited taking under the Endangered Species Act.  16 U.S.C. § 1536(o)(2); 50 C.F.R. § 402.14(i)(5).

## B.    The National Environmental Policy Act

The purpose of the National Environmental Policy Act is to focus the attention of the government and the public on the likely environmental consequences of a proposed

action before the action is implemented.  *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 371 (1989).  Specifically, the Act states that:

> The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall--
> * * *
> (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on--
> (i) the environmental impact of the proposed action,
> (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
> (iii) alternatives to the proposed action,
> (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
> (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332.

Under the regulations interpreting the Act, agencies are allowed discretion as to whether the preparation of an environmental impact statement is necessary:

> In determining whether to prepare an environmental impact statement the Federal agency shall:
> (a) Determine under its procedures supplementing these regulations (described in § 1507.3) whether the proposal is one which:
> (1) Normally requires an environmental impact statement, or
> (2) Normally does not require either an environmental impact statement or an environmental assessment (categorical exclusion).

40 C.F.R. § 1501.4.  Categorical exclusion is defined as follows:

> a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations (§ 1507.3) and for which, therefore, neither an environmental assessment nor an environmental impact statement is required. An agency may decide in its procedures or otherwise, to prepare environmental assessments for the reasons stated in § 1508.9 even though it is not required to do so. Any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect.

*Id*. § 1508.4.

In addition to the categorical exclusion, an agency may avoid the preparation of an environmental impact statement by preparing an environmental assessment. The implementing regulation provides that an environmental assessment:

(a)     Means a concise public document for which a Federal agency is responsible that serves to:
(1)     Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.
(2)     Aid an agency's compliance with the Act when no environmental impact statement is necessary.
(3)     Facilitate preparation of a statement when one is necessary.
(b)     Shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

*Id*. § 1508.9. If, based on that assessment, the agency determines that the action will not significantly affect the environment, it makes a finding of no significant impact, 40 C.F.R. § 1508.13, and its review under the Environmental Policy Act is complete.

## III. FACTUAL BACKGROUND

### A.    City of Seattle's Water Supply

The City of Seattle began diverting water from the Cedar River in 1901 to meet its municipal and industrial water supply needs. Conservation Plan, § 2.2.2. Since then, the City has taken steps to protect the quality of the water and has continued to acquire fee ownership of Cedar River watershed properties from homesteaders, private timber companies, and other governments. *Id.* As of 2000, the City's watershed ownership was over 90,500 acres, or essentially all of the land within the hydrographic boundary upstream of its water supply intake, as well as additional land outside the hydrographic boundary needed for overall watershed protection. *Id.*

The original configuration of the Cedar River supply system included a diversion dam (built in 1900) at Landsburg, approximately 21.8 miles upstream from the present outlet of the river into Lake Washington. *Id.* § 2.2.3. Since its construction, the Landsburg Diversion Dam has blocked upstream passage of anadromous fish. *Id.*

1    **B.    City of Seattle's Incidental Take Permit**

2         During the 1990's, naturally reproducing populations of anadromous fish in the

3    Lake Washington Basin have declined.  *Id*. § 4.3.1.  Since 1990, record low adult returns

4    have been reported in the Cedar River.  *Id*.  While there have been several isolated

5    examples of relatively strong runs of salmon, the population trend has been one of

6    substantial decline.  *Id*.

7         In this case, Plaintiff has raised concerns regarding the Puget Sound "Chinook

8    salmon and other species of native fish."  Dkt. 54, ¶¶ 37-41, 45, 62, 64, 65.  On March 24,

9    1999, NMFS listed Puget Sound Chinook salmon as a threatened species.  64 Fed. Reg.

10   14,308 (1999).  On July 10, 2000, NMFS extended the Section 9 take prohibition to Puget

11   Sound Chinook, including the Cedar River Chinook.  65 Fed. Reg. 42,422 (2000).

12        When these salmonid species began to be listed under the Endangered Species Act,

13   the City of Seattle sought an incidental take permit from NMFS under Section 10 of the

14   Act.  Conservation Plan § 2.1-2.4.  The City requested that the permit

15   provide coverage for its water supply and watershed management activities that

16   incidentally take listed species.  *Id*.  Under the requirements of Section 10, the City

17   created the Conservation Plan that identified potential impacts to species, outlined steps

18   to minimize and mitigate those impacts, and analyzed alternative actions.  *Id*.; 16 U.S.C. §

19   1539(a)(2)(A).  The City sought coverage for listed Puget Sound Chinook as well as a

20   number of unlisted species.  Conservation Plan, § 1.4.  The Conservation Plan included an

21   analysis of effects to some unlisted species so that if those species were subsequently

22   listed as threatened or endangered under the Act, the City would have coverage for the

23   incidental take of those species as well.

24        One of the unlisted species included in the Conservation Plan was the Cedar River

25   sockeye salmon.  Because the City requested that sockeye be covered by the Conservation

26   Plan and the accompanying incidental take permit, the City was required to minimize and

27   mitigate the impacts of the incidental take of the Cedar River sockeye to the maximum

28

extent practicable.  16 U.S.C. § 1539(a)(2)(B)(i) - (iv); 50 C.F.R. 222.307(c)(2).  The City

included an interim sockeye hatchery and a proposed new sockeye hatchery as the

sources of mitigation. Conservation Plan, § 4.3, p. 10.  The hatcheries are necessary

because the sockeye in the Cedar River are too numerous to be allowed above the

Landsburg dam. *Id*. at p. 22.  The number of "adult sockeye, or a substantial portion of

that number, would pose an unacceptable risk to public health if allowed to spawn

naturally above the diversion and water intake at Landsburg." *Id*.  The federal

Defendants claim that "the hatcheries did not serve any other purpose in the

[Conservation Plan]." Dkt. 75 at 10.

It is important to note that mitigation for species other than sockeye was

accomplished by construction of fish passage facilities.  Conservation Plan, § 4.3, pp.

21-22.  The Conservation Plan provides as follows:

> Four facilities are prescribed to provide safe upstream and
> downstream passage of migrating chinook, coho, and steelhead into and out
> of the municipal watershed upstream of the Landsburg Diversion Dam: (1) a
> fish ladder at the Landsburg Diversion Dam; (2) a fish ladder and holding
> and sorting facilities at the partial migration barrier created by the City's
> water supply line crossing approximately 1/3 mile downstream from the
> Landsburg Diversion Dam; (3) downstream fish passage facilities at the
> Landsburg Diversion Dam; and (4) new screening facilities on the municipal
> water supply intake to minimize juvenile fish injury or migration delays.
> Once fish passage facilities are completed, all native fish species in the
> Cedar River, with the exception of sockeye salmon, will be allowed access
> to the municipal watershed through the fish passage facilities.

Conservation Plan, § 4.3, p. 6.

Section 7 of the Endangered Species Act required NMFS, as the agency with

jurisdiction over the listed species, to consult with itself, as the permit issuing agency, on

the effects of the proposed action on listed species.  16 U.S.C. § 1536(a)(2).  NMFS

evaluated the proposed action and concluded that it would not jeopardize the continued

existence of any listed species or destroy or adversely modify critical habitat. AR Volume

II Document 8 ("Biological Opinion") at 134-35.  Section 10 of the Endangered Species

Act required NMFS to evaluate numerous factors to determine if issuance of a permit was

appropriate. 16 U.S.C. § 1539(a)(2)(A); 50 C.F.R. § 222.307(c).  NMFS evaluated the following:

> (i) The status of the affected species or stocks; (ii) The potential severity of direct, indirect, and cumulative impacts on the species or stocks and habitat as a result of the proposed activity; (iii) The availability of effective monitoring techniques; (iv) The use of the best available technology for minimizing or mitigating impacts; and (v) The views of the public, scientists, and other interested parties knowledgeable of the species or stocks or other matters relating to the application.

50 C.F.R. § 222.307(c)(1); Biological Opinion at 141-43.

After opportunity for public comment and analysis of the record before it, NMFS concluded that:

> (i) The taking will be incidental; (ii) The applicant will, to the maximum extent practicable, monitor, minimize, and mitigate the impacts of such taking; (iii) The taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild; (iv) The applicant has amended the conservation plan to include any measures (not originally proposed by the applicant) that the Assistant Administrator determines are necessary or appropriate; and (v) There are adequate assurances that the conservation plan will be funded and implemented, including any measures required by the Assistant Administrator.

50 C.F.R. § 222.307(c)(2); Biological Opinion at 143-45.

Then, NMFS evaluated the Conservation Plan pursuant to the requirements of the National Environmental Policy Act.  NMFS developed an Environmental Assessment and made a finding of no significant impact.  AR Volume II Documents 9, 11A.  NMFS claims that this concluded its required review under the National Environmental Policy Act.  Dkt. 75 at 11.  Plaintiff, however, claims that NMFS acted:

> contrary to [the National Environmental Policy Act] by failing: (a) to assess the impacts of the City's proposed Cedar River Sockeye Hatchery on . . . Chinook salmon and other native species of fish, (b) to consider an alternative that affords greater certainty of mitigation for Hatchery impacts on native salmon; and (c) to prepare an [environmental impact statement] for the [Conservation Plan], [City's Incidental Take Permit], and incorporated [Landsburg Mitigation Agreement].

Dkt. 54, ¶ 64.

On March 21, 2000, NMFS issued the requested Section 10 permit to the City of Seattle.  AR Volume I Document 7 ("Incidental Take Permit").  That permit provided the

City exemption for the take of listed species incidental to its water supply and watershed management activities, subject to certain terms and conditions. *Id.* The permit covered listed Puget Sound Chinook salmon as well as a number of unlisted species, including Cedar River sockeye salmon. *Id.*

**C.    Plaintiff's Involvement and the City's Request for an Amended Permit**

Plaintiff originally filed this action challenging aspects of the City's incidental take permit. Dkt. 1. Plaintiff claims that she has been highly involved in the Cedar River anadromous fisheries management both professionally and as a volunteer. Dkt. 54, ¶ 5. She also claims that she "owns a residence in the City of Seattle, and has a financial and civic interest in the decisions made by NMFS with respect to the Cedar River." *Id.* Moreover, she claims that she has visited and continues to visit the Cedar Basin to observe the species covered by the City of Seattle's Incidental Take Permit. Declaration of Roz Glasser in Support of Standing, Dkt. 76-2.

After this action was filed, the City of Seattle asked NMFS to amend the Incidental Take Permit to remove coverage for the unlisted Cedar River sockeye stock and for both the interim sockeye hatchery and the planned permanent sockeye hatchery. 72 Fed. Reg. 33977 (June 20, 2007). NMFS requested comments on whether the City's permit, if amended as requested, would still meet the statutory criteria for the issuance of an incidental take permit. *Id.*

Plaintiff commented on the proposed amendment. Amendment AR Document 6. Plaintiff argued: (1) that the sockeye hatcheries will have adverse impacts on listed Chinook salmon, (2) that NMFS had failed to ensure proper implementation of the adaptive management mitigation measures in the Conservation Plan and accompanying agreements and (3) that NMFS's actions required an Environmental Impact Statement and reinitiation of consultation under Section 7 of the Endangered Species Act. *Id.*

On August 7, 2007, NMFS concluded that the City was entitled to the requested permit amendment. Amendment AR Document 4 ("Decision Memorandum"). NMFS

made findings pursuant to Section 10(a)(2)(B) of the Endangered Species Act and

determined that reinitiation of consultation under Section 7 of the Act was not required.

*Id.* at 2-4.  Specifically, Defendant Lohn stated that "there was no new information about

effects to listed species or designated critical habitat that [NMFS] did not consider in

2000 and 2003." *Id.* at 5.

       In response to the amendment, the parties stipulated to a stay of Plaintiff's

challenge to the original Incidental Take Permit.  Dkts. 47, 48.  Plaintiff then filed a

supplemental complaint challenging the amendment.  Dkt. 54.  Plaintiff added additional

allegations to one of her original causes of action and asserted two new causes of action.

*Id.* ¶ 65, 66-70, 71-72.  The causes of action before the Court are:

        (1)    Fourth Cause of Action – Failure to Prepare an Adequate
        Environmental Analysis Under [the National Environmental Policy Act];
        (2)    Fifth Cause of Action – NMFS Lacked Sufficient Information
        to Make Its August 7, 2007, Determination Amending The City's Cedar
        River [Conservation Plan] and [Incidental Take Permit] Removing The City's
        Proposed Cedar River Sockeye Hatchery; and
        (3)    Sixth Cause of Action – NMFS's Failure to Reinitate Section 7
        Consultation is Arbitrary, Capricious and Contrary to the [Endangered
        Species Act].

*Id.*  Plaintiff asserts three requests for relief:

        (1)    Declare that NMFS's approval of the City's request to remove
        the [sockeye] Hatchery from the Cedar River [Conservation Plan] and
        [Incidental Take Permit] is arbitrary, capricious, contrary to the best available
        science, and in violation of the [Endangered Species Act] and the
        [Administrative Procedures Act], 5 U.S.C. § 706(2);
        (2)    Declare that NMFS acted arbitrarily, capriciously, and contrary
        to [the National Environmental Policy Act], 42 U.S.C. § 4332(2)(C), in
        violation of the [Administrative Procedures Act], 5 U.S.C. § 706(2), by
        failing to prepare an [Environmental Impact Statement] or any other
        environmental impact analyses on the City's request to remove the [sockeye]
        Hatchery from the Cedar River [Conservation Plan] and [Incidental Take
        Permit]; and
        (3)    Order NMFS to rescind its action amending the Cedar River
        [Conservation Plan] and [Incidental Take Permit] to remove the [sockeye]
        Hatchery from coverage under, and hence NMFS oversight under, said
        [Conservation Plan] and [Incidental Take Permit].

*Id.*, ¶¶ A.1, B.1, C.1.

# IV. DISCUSSION

In their cross-motions for summary judgment, both the federal Defendants and the Intervenor-Defendants have challenged Plaintiff's standing to bring this action. Dkts. 74 at 13-14 and 75 at 13-15. The Court need not address the issues presented in the remainder of the summary judgment motions because the Court finds that Plaintiff lacks standing to pursue her claims.

To satisfy Article III standing requirements, a plaintiff must show that: (1) plaintiff has suffered "injury in fact" that is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-81(2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61). Plaintiff bears the burden of proof to establish standing. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 (1998).

## A.    Injury

Plaintiff claims that she has been injured in two ways: (1) the taking authorized by the permit affects her enjoyment of the endangered species and (2) she has a strong interest in seeing that Defendants comply with the procedural obligations of the Endangered Species Act and the National Environmental Policy Act. Glasser Declaration in Support of Standing, Dkt. 76-2. The federal Defendants argue that Plaintiff's procedural injury is not sufficient to confer standing. Dkt. 77 at 3. Plaintiff counters that Defendants' procedural failure is a sufficient injury in fact. Dkt. 76 at 4-6.

The Ninth Circuit has "long recognized that failure to follow procedures designed to ensure that the environmental consequences of a project are adequately evaluated is a sufficient injury in fact to support standing." *City of Davis v. Coleman*, 521 F.2d 661, 671 (9th Cir. 1975). In *Coleman*, the plaintiff brought an action against the Secretary of Transportation and others for an injunction against the construction of a proposed freeway

interchange.  *Id.* at 666-71.  The defendants did not prepare an environmental impact statement, as outlined in the National Environmental Policy Act, on the effects of the proposed freeway interchange.  *Id.*  The district court determined that the plaintiff lacked standing to maintain its claims based on defendants' failure to comply with the Act.  *Id.*  The Ninth Circuit reversed holding that plaintiff had standing and that defendants were required to prepare the impact statement.  *Id.* at 670-672.  The court stated that the Act:

> requires federal agencies contemplating major action to follow a procedure preparing and considering an [impact statement] whenever the proposed action may significantly affect the quality of the human environment. 42 U.S.C. § 4332(2)(C). Failing to follow this procedure creates a risk that serious and avoidable environmental consequences of the action, which an [impact statement] would reveal, will not be brought to the attention of agency decisionmakers. Thus, if a particular project does in fact entail serious but nonobvious environmental impacts, agency failure to prepare an [impact statement] may mean that the last opportunity to eliminate or minimize these impacts, in accordance with [the Act's] broad objectives, has been lost.

*Id.* at 670.  Moreover, "[t]he procedural injury implicit in agency failure to prepare an [impact statement,] the creation of a risk that serious environmental impacts will be overlooked[,] is itself a sufficient 'injury in fact' to support standing . . . ."  *Id.*

In this case, Plaintiff claims that "The procedural duties of the [Endangered Species Act] and the [National Environmental Policy Act] . . . provide the basis for standing."  Dkt. 76 at 5.  NMFS's action, however, does not involve the environmental consequences of a particular project.  The action *removed* the City of Seattle's protection for construction of both the interim and the permanent sockeye hatcheries.  Without that protection, Plaintiff is free "to sue Seattle for allegedly taking [endangered Cedar River] chinook through operation of the [sockeye] hatcheries."  Dkt. 74 at 14.  NMFS's action in this case is arguably the exact opposite of the federal agency's *inaction* that injured the plaintiff in the *Coleman* case.  In *Coleman*, the defendants built without assessing the environmental impact and, in this case, Defendants completed an environmental assessment with a finding of no significant impact before they began building the sockeye hatcheries.  Now that the assessment of no significant impact of the sockeye hatcheries has essentially been vacated by the amended permit, Plaintiff is *susceptible* to injury.  For

1  example, Plaintiff may be injured if the construction of the sockeye hatcheries continues

2  without Defendants following the proper procedures, which could mean an assessment of

3  the environmental impact of that construction.  Plaintiff may be injured if NMFS

4  amended the permit a second time to include the sockeye hatcheries without following the

5  proper procedures.  Plaintiff, however, has failed to show that she suffered a "procedural

6  injury implicit" in NMFS's alleged failure to follow proper procedures in amending the

7  City of Seattle's incidental take permit to *exclude* coverage for the sockeye hatcheries.

8  Plaintiff's reliance on *Coleman* is misplaced based on the facts of this case.

9       Although Plaintiff has arguably failed to bear her burden of establishing an injury

10  due to Defendants' alleged failure to comply with the procedural safeguards of the

11  Endangered Species Act and the National Environmental Policy Act, the Court will also

12  address this alleged injury under the other requirements for standing.  Additionally,

13  Defendants do not challenge Plaintiff's other alleged injury, her enjoyment of the

14  endangered species affected by the City of Seattle's incidental take from the Cedar River.

15  **B.  Fairly Traceable**

16       The federal Defendants argue that "the agency action at issue does not cause any

17  [of Plaintiff's] alleged injuries that result from the [sockeye] hatcheries."  Dkt. 77 at 3.

18  Plaintiff has declared that "[f]ailure by the defendants to properly evaluate the impacts of

19  the existing 'interim' Cedar River sockeye hatchery, and of the much larger proposed

20  permanent hatchery, will directly and significantly adversely impact [her] personally."

21  Glasser Decl., ¶ 3.  Plaintiff's assertion leaps from the alleged cause of her injury to the

22  alleged injury itself without sufficient explanation as to *how* the former causes the latter.

23  This is important because articulating *how* the action caused the injury would illuminate

24  the requirement for standing of Defendants' action being fairly traceable to Plaintiff's

25  injury.

26       Plaintiff does argue that her injuries were caused by NMFS's "failure to conduct

27  any review of its discretionary action under [the National Environmental Policy Act], and

28

ORDER - 17

1    the potential take of [Endangered Species Act]-listed species resulting from elimination of

2    NMFS's own oversight over and ability to require mitigation for impacts of the [sockeye]

3    hatchery." Dkt. 79 at 3. NMFS, however, has *lost* oversight over the sockeye hatcheries.

4    Plaintiff fails to address or recognize this fact.

5         When a species is listed as endangered, it is unlawful for any person to take an

6    animal of that species within the United States. *See* 16 U.S.C. § 1538(a)(1). That

7    prohibition may be enforced by either the government or a private citizen. *See id.* § 1540.

8    An incidental take permit is an *exception* to both the prohibition against taking and the

9    enforcement provisions the Endangered Species Act. *See id.* § 1539. In this case, when

10   NMFS issued the permit to the City of Seattle that covered the sockeye hatcheries, it then

11   had an obligation to specify "reasonable and prudent measures" that are "necessary and

12   appropriate to minimize" the impact of incidental take of endangered species. *See* 50

13   C.F.R. § 402.14(i). After the original permit was issued, NMFS retained oversight over

14   the excluded, or "covered," activities that resulted in take of the endangered species. That

15   oversight included the right to amend or modify the permit for "just cause," 50 C.F.R. §

16   222.306, and to monitor the incidental take conditions for changed circumstances,

17   whether the new circumstances were provided for, not provided for, or unforseen. *Id.* §

18   222.307. Because the sockeye hatcheries were included in the permit, NMFS had an

19   obligation to monitor the affect of their construction and operation on the take of

20   endangered species that were listed in the incidental take permit, namely Puget Sound

21   Chinook salmon. The amendment significantly altered that status quo.

22        The City of Seattle requested, and NMFS granted, the removal of the sockeye

23   hatcheries from the City of Seattle's incidental take permit. Thus, the City of Seattle *lost*

24   its protection for, or exclusion under the Endangered Species Act for, the take (defined as

25   "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect") of endangered

26   species due to construction of or operation of the sockeye hatcheries. Based on the

27   current status quo, Plaintiff's argument is hard to follow. It seems that she claims she is

28

ORDER - 18

injured because the agency did not follow the "proper" procedures in reaching a decision that allows her to privately enforce the take of the endangered chinook salmon. Whatever "mitigation" Plaintiff believes is necessary for the "impact of the [sockeye hatcheries]" is arguably the cause of action for a private enforcement suit and not the cause of action for an inadequate procedure suit.

Plaintiff's final argument regarding how Defendants' actions caused Plaintiff's injury touches on some hypothetical effects caused by the alleged "unlawful amendment." Plaintiff claims that:

> Defendants argue that, if the Permit amendment is allowed to take effect, [Plaintiff] can now sue the City for any take of Chinook caused by sockeye salmon and/or the hatchery under [the Endangered Species Act] Section 9, and therefore she can not have suffered any injury from the Permit amendment. Defendants' conclusion does not follow from the premise. The unlawful amendment of the Permit may cause many different effects; but the fact that one of them may be beneficial does not mean that the others caused no injury. Moreover, the possible presence of an alternative remedy is irrelevant to the legality of the challenged action.

Dkt. 76 at 6, n.3. First, Plaintiff bears the burden to establish standing. *Citizens for a Better Env't*, 523 U.S. at 104. Second, when faced with a summary judgment motion, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). Plaintiff's statement that "the fact that one of [the effects of the alleged unlawful amendment] may be beneficial does not mean that the other caused no injury" is insufficient. Plaintiff has the burden of showing that *her* injury is fairly traceable to Defendants' action of issuing the amended permit. Plaintiff's argument regarding some "caused" injury is unsupported by the record.

Therefore, Plaintiff has failed to show that either of her alleged injuries are fairly traceable to Defendants' alleged failure to assess an activity that is currently *unprotected* by the City of Seattle's incidental take permit.

1    **C.    Redressable**

2         The federal Defendants argue that even if Plaintiff has shown an injury that is

3    fairly traceable to their conduct, Plaintiff "still has not shown that her injuries are

4    redressable here."  Dkt. 77 at 4.  Specifically, the federal Defendants maintain that:

5              vacatur of the agency action, issuance of an amended permit, would
               not result in automatic reinstatement of the old permit. Rather, even if
6              Plaintiff could succeed on the merits of her claim, the Court's remedy would
               be to vacate the agency action, which was issuance of the amended permit. In
7              that case, the next step for NMFS and the City would be to reevaluate the
               permit requested by the City, which does not include the hatcheries, or to
8              re-evaluate a new permit requested by the City. The Court could not order
               NMFS to re-issue a permit that the City no longer wants.
9
10   Dkt. 77 at 4.  Plaintiff counters that:

11             if this court finds [that] NMFS's action amending the permit invalid under
               [the Endangered Species Act] or [the National Environmental Policy Act], the
               City may still request the permit amendment. NMFS would simply need to
12             comply with applicable law before making a decision to grant the request. As
               a result, NMFS has not shown that [Plaintiff's] procedural and substantive
13             injuries are neither actual nor redressable by this court.

14   Dkt. 79 at 3-4.  In other words, Plaintiff argues that the amended permit may

15   subsequently be issued as-is, but NMFS should be required to comply with the

16   applicable law during consideration of that hypothetical re-issue.  The Supreme

17   Court "has repeatedly held that an asserted right to have the Government act in

18   accordance with law is not sufficient, standing alone, to confer jurisdiction on a

19   federal court."  *Allen v. Wright*, 468 U.S. 737, 754 (1984).  Plaintiff's request that

20   NMFS act in accordance with the law is not an issue that can be redressed by a

21   favorable decision from  this Court.

22   **D.    Summary**

23        While the Court is concerned about the protection of threatened or

24   endangered species, especially local salmon, it is without jurisdiction to hear

25   Plaintiff's claims because Plaintiff has failed to establish that she has standing to

26   bring this action.  Accordingly, Defendants' Motions for Summary Judgment (Dkts.

27   74 and 75) are granted and Plaintiff's Supplemental Complaint (Dkt. 54) is

28

ORDER - 20

dismissed.  Moreover, based on the Court's order granting the Stipulated Motion to Stay, Plaintiff's original Complaint (Dkt. 1) is also dismissed.

### V. ORDER

Therefore, it is hereby

**ORDERED** that Federal Defendants' Cross-Motion for Summary Judgment (Dkt. 75) is **GRANTED** and Intevenor-Defendants' Cross-Motion for Summary Judgment (Dkt. 74) is **GRANTED**.  Plaintiff's Motion for Summary Judgment (Dkt. 70) is **DENIED** as moot.

Plaintiff's Complaint (Dkt. 1) and Plaintiff's First Supplemental Complaint (Dkt. 54) are **DISMISSED with prejudice**.

DATED this 17th day of July, 2008.


BENJAMIN H. SETTLE
United States District Judge